Filed 5/6/21  In re F.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re F.M., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E075407 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ003049) |
| v. | OPINION |
| Y.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Michael J. Rushton, Judge. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Prabhath D. Shettigar, Deputy County Counsel for Plaintiff and Respondent.

1

In this appeal Y.S. (mother) challenges the juvenile court's jurisdictional and dispositional orders regarding her now five-year-old daughter, Frankie M. After sustaining three jurisdictional allegations against mother related to substance abuse, domestic violence, and failure to protect from sexual abuse, the juvenile court declared Frankie a dependent, removed her from mother's care, and ordered the Riverside County Department of Public Social Services (the department) to provide family reunification services. Mother argues these orders lack evidentiary support because she does not currently pose a risk to her daughter. We disagree and affirm.

## I

## FACTS

A.    *Background*

Mother has a both a criminal and child welfare history. In 2004, the department filed dependency petitions on behalf of her three oldest children, Steven, Thomas, and Destiny. The department alleged mother physically abused Destiny, committed acts of domestic violence against the children's fathers, and had a history of drug abuse. When the social worker visited the home, she suspected mother was under the influence and also found "a multitude of bruises" on Destiny, "in varying degrees of color." In addition to several bruises on her arms in the shape of fingerprints, the social worker found a bruise on both of Destiny's cheeks, a cut near her left eye, a large bruise on her chin, a dark bruise on her buttocks, and a bruise on the middle of her back near one of her vertebra. Destiny and her two brothers told the social worker that mother would beat her.

2

The juvenile court exercised dependency jurisdiction over all three children and ultimately granted sole physical custody of the children to their fathers. The court also issued a restraining order against mother.

For her abuse of Destiny, mother was convicted of misdemeanor inflicting injury on a child in March 2004. She was sentenced to 180 days in jail, a 52-week anger management program, and a drug rehabilitation program. In May 2004, she was convicted of felony inflicting corporal injury on a cohabitant and sentenced to additional jail time and another anger management and drug rehabilitation program. In October 2004, she was convicted of misdemeanor battery. In 2006, she was convicted of felony assault with a deadly weapon and was sentenced to 270 days in jail and another anger management program.

Over the next several years, mother had three more children: Laila (born in 2009) and Jayde (born in 2011) whose father is George, and Frankie—the subject of the current dependency—whose father is Robert (father).[1] In 2016, the department filed a dependency petition on behalf of all three children after Frankie tested positive for amphetamines at birth. Mother told the social worker she had run away from home at age 15 and, until she was about 25, had lived on the street and used drugs. She said she had been using methamphetamine but had checked herself into a treatment program about seven months earlier and no longer had a problem. She said the only reason she had used during Frankie's pregnancy was that she was under a lot of stress.

---

[1] Though the juvenile court made a jurisdictional finding against father in this dependency, he has not challenged it and therefore isn't a party to this appeal.

Mother also admitted there were domestic violence issues between her and father but said he would always end up leaving before she had to call the police. Father expressed surprise when the social worker told him Frankie had tested positive for amphetamines. He said he knew mother used to struggle with drug abuse but thought it was behind her. He said he'd already decided to break up with her anyway because she constantly lashed out at him and tried to provoke fights. He hoped they could successfully coparent Frankie, but not if she continued to use drugs.

The juvenile court removed all three children from mother and placed them with their fathers. It ordered family reunification services for mother, which included drug testing and treatment and an anger management program. After several months of services, the court terminated the dependency by returning Frankie to both parents and issuing family law orders granting George primary custody of Laila and Jayde.

B.      *The Current Dependency Petition*

Frankie came to the department's attention again on November 15, 2019, when she was three years old. A referral alleged that the maternal uncle, Gabby, had touched Frankie's privates, and that mother had taken the child from the hospital before she could be examined. According to a nurse who had spoken with father, Frankie told him that Gabby had touched her and her privates hurt. Father checked and thought her vagina looked swollen and red so he took her to the emergency room at Hemet Valley Hospital, but mother had shown up and taken her away before she could be seen. Father said when he contacted the police about the incident they said they couldn't do anything because

4

mother shared custody of Frankie and they didn't know where she was. Father also told the nurse that he had moved in with mother to keep an eye on his daughter because mother uses methamphetamine and would leave Frankie "in anyone's care."

After multiple unsuccessful attempts to speak with the parents, the social worker received a call from father on November 25. He said mother had ended up taking Frankie to a different hospital to have her examined because she didn't like Hemet Valley. He said he and mother live in different units on the same property.

The social worker wasn't able to set up a meeting with the family until January 27, 2020. In his separate interview, father reiterated his concern that Gabby had molested Frankie. He said he was upset with mother because it seemed like she was trying to cover for Gabby who had touched other family members in the past. Mother admitted Gabby had molested other family members but said she didn't think he had touched Frankie. She also admitted having a history of using methamphetamine.

That same day, the social worker also spoke with Laila and Jayde. They said they had heard about Gabby having molested Frankie and, as a result, their father (George) no longer allowed them to go to Gabby's house. Two days later, father told the social worker he thought mother was using drugs again.

The social worker contacted law enforcement and learned that mother and father had recently made several domestic violence reports against each other. On November 15, the day father had taken Frankie to the hospital, mother had called the police to report he had pushed her and punched her in the leg two days earlier. The dispatcher had noted

5

mother had sounded under the influence during the call. Mother also went to the Hemet Police Department that day to make the same report. On December 1, she called the police to report that father was trying to take her TV. On January 17, she called the police to report that two of her exes (one of which was father) were at her home "disturbing the peace," but no one was home when the police responded. On January 25, George called the police to report that mother had taken one of his daughters and would not return her. On January 26, mother called the police to report father was being violent and arguing with her "in front of [her] children," but she ended up cancelling the call saying he had left.

A few days after the in-person interviews, on January 30, the social worker asked the parents to drug test. Mother refused, saying she hadn't used for eight months. She said she had checked herself into a recovery program but quit because "it was not for me." Mother told the social worker, "you need to focus on my daughter being sexually abused and not [on] me."

About a week later, the social worker spoke with George, who said he was worried mother was using methamphetamine again and engaging in domestic violence with father. He said that on January 25, one of his daughters called him because mother and father were physically fighting with each other in front of her. George said mother's drug use and fighting with father had caused him to recently seek sole custody of Laila and Jayde in family court and the hearing on his request was scheduled for April.

6

On February 5, father texted the social worker saying mother was acting erratic and appeared to be high on methamphetamine. He said she was supposed to be caring for Frankie that day but hadn't been home for hours. The social worker went to the home the next day but no one was there. She ended up speaking with father later that day, and he told her he was very concerned about mother's recent behavior and wanted to seek full custody of Frankie.

On February 12, father sent the social worker an angry text saying the department had not done enough to investigate Frankie's molestation. He asked the social worker to leave him and Frankie alone and said he wouldn't respond to calls or texts. He said everything was fine with his family now and that it turned out mother hadn't actually been on drugs the other day, she had been taking medication to treat a bladder infection.

On February 14, the department filed a dependency petition on behalf of Frankie, alleging she was a child as described by Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[2] The petition made the following three allegations: (1) mother had a history of substance abuse, had admitted to recently using methamphetamine, and had failed to benefit from a treatment program; (2) mother and father engaged in domestic violence in Frankie's presence; and (3) Frankie was at substantial risk for sexual abuse as a result of mother's failure to protect her from Gabby.

---

[2] Unlabeled statutory citations refer to the Welfare and Institutions Code.

C.      *Detention*

The juvenile court held the detention hearing on March 2, 2020. Mother was not present and father (who was) said she and Frankie were home sick. The court trailed the hearing for the following day and ordered the department to go to the home to check on mother's health and give her a saliva drug test. Mother's test was positive for methamphetamine.

Mother didn't attend the hearing the next day either. The court said it found her behavior of taking Frankie from the hospital before she could be examined for sexual abuse "extremely concerning," especially considering she has been using methamphetamine. The court detained Frankie from mother and ordered father not to let her have any contact with the child. The court ordered weekly supervised telephone or video chat visits for mother.

On March 17, father met with the social worker at the department's office in Hemet and reiterated his concern they were taking too long to investigate Frankie's report of sexual abuse. He said he worried about submitting his daughter to another interview or exam because she hadn't mentioned the abuse since she reported it, and he didn't want her to have to think or speak of it again. The social worker told him that a forensic interview was important, and he ultimately agreed he'd let Frankie sit for one as soon as it was safe to do so due to the COVID-19 pandemic.

That same day, an officer from the Hemet Police Department interviewed father about the alleged sexual abuse. Father said that on the day of the incident mother had left

8

Frankie alone with her sister and her sister's husband, Gabby. After mother picked Frankie up and dropped her off with father for the evening, Frankie told him Gabby had touched her and that her privates hurt. He then recounted how he had taken Frankie to Hemet Valley Hospital and mother had taken her and "fled." Father said he had found mother later that day at Menifee Valley Hospital, where they found no evidence of "sexual penetration." He said Frankie was now in his sole custody and he was not allowing her to be near Gabby.

On March 18, the department referred mother to a drug treatment program, as well as domestic violence and parenting classes.

On March 30, the social worker interviewed the parents about the petition allegations for the department's jurisdiction and disposition report. Mother told the social worker she hadn't started services yet but intended to. She said father had come to her home two days earlier, "ripped" Frankie from her arms and refused to give her back. The social worker informed mother that Frankie had been removed from *her* care on March 3 and that she was violating the court's order if she was seeing her daughter outside of supervised visits. At this point, mother became upset and questioned why the court gave Frankie to father. She said he was abusive and has beat her black and blue before while she was holding Frankie. She said she used to have pictures and videos proving his abuse but he'd destroyed them when he broke her phone.

Regarding the allegations of failure to protect from sexual abuse, mother told the social worker that she has been very protective. She said she had already taken Frankie to

the hospital once to be examined for sexual abuse even before the department had become involved, in September 2019. She said this was the reason she had taken Frankie from the hospital two months later when father had brought her in for examination: she didn't think her daughter should "have to go through that again." She said nothing about not liking that hospital and taking Frankie to a different one (which is what father said happened).

In his interview, father tried to explain the incident from two days earlier. He said he'd been walking outside his unit with Frankie when mother appeared, grabbed the child, and would not let her go. He said he and Frankie had been staying with a relative in Visalia since that incident to avoid in-person contact with mother. He said mother was a drug addict and habitual liar who couldn't be trusted.

The social worker later learned that on March 28 father called the police to report mother had taken Frankie even though she was not supposed to have custody. She also learned that on the following day mother had called the police to report that father had ripped Frankie from her arms the previous night.

On May 4, mother sent the social worker a text saying she'd been documenting everything and the social worker was "going to be in trouble" for listening to father but not her. In response, the social worker called mother, who picked up and said she couldn't talk because she was at work. The social worker then texted her asking her to take a urine test that day, to which mother responded, "Sorry I would but I'm not in town." Mother said the social worker instead "need[ed] to investigate the father and how

he is using Frankie to get at me." The exchange ended with mother telling the social worker that she didn't trust her and wanted a new social worker.

That same day, father texted the social worker saying the only reason he had been around mother for so long was to keep Frankie safe. He said he felt he had to stay close by because mother would "leave Frankie with different family members [and] get high."

On May 5, the detective investigating Frankie's criminal case called the social worker to report that he had to close the case for lack of evidence because Frankie had not disclosed any inappropriate touching or sexual abuse during her recent forensic interview.

On May 18, Frankie's therapist reported that Frankie's mental health assessment and first therapy session had gone well.

On May 28, the parents and Frankie attended a child and family team meeting by teleconference with the social worker and a meeting facilitator. During the meeting, mother began ranting and denigrating father's parenting abilities. The facilitator had to redirect her and ask her to remain calm, but when they started talking about Frankie's education, she became angry again and yelled and cursed at father. When the facilitator asked her to calm down and reminded her that Frankie was present, she became even more angry and said the meeting was "pointless and a waste of her time."

About a month later, the social worker met with father and Frankie through video chat. Frankie appeared healthy and happy. She said she liked swimming and going to the park and had her own bed to sleep in at her relative's home. Father told the social worker

that Frankie was doing great. She had been to the doctor and the dentist, and she was healthy and up to date on her vaccinations. He sent the social worker documentation from her dental visit and wellness check confirming this.

On May 28, father's and Frankie's therapist told the social worker that they had both been participating in counseling services. On July 1, mother texted the social worker saying she had started attending individual therapy but didn't respond when the social worker asked for a letter of enrollment and for the therapist's phone number. On June 9, the social worker received the results of a drug test mother had taken on May 25; they were negative.

Mother's visits in the month of June did not go particularly well. On June 10, although she had confirmed the visit earlier that day, she did not answer her phone when the supervising social worker made multiple attempts to start the visit. Mother later called the social worker and yelled at her for cancelling the meeting. The social worker was unable to talk over mother's yelling so she hung up. This was the third visit mother had missed. In the weeks that followed, mother missed another visit without explanation, then called the social worker the next day to say her phone was turned off. Another visit had to be cut short because she tried to bring her new boyfriend onto the video chat.

Before the jurisdiction and disposition hearing, the department filed a report recommending the court remove Frankie from mother with family reunification services and allow her to remain in father's care.

D.      *Jurisdiction and Disposition Hearing*

The court held the jurisdiction and disposition hearing on July 8, 2020. Mother provided the following stipulated testimony: "I previously had issues with substance abuse but recently had a negative hair follicle test, and I've been sober for a while. I deny being the aggressor for any domestic violence incidents. I brought Frankie to the doctor in Menifee after the incident with the uncle, and Frankie has not had contact with the uncle since that incident."

The court found the petition's allegations true, declared Frankie a dependent, found that mother had made insufficient progress on her case plan, and found that Frankie could not safely be returned to her care. The court ordered family reunification services for mother and family maintenance services for father.

**II**

**ANALYSIS**

Mother challenges the evidentiary support for the court's jurisdictional and dispositional findings and orders.

A.      *Applicable Legal Principles*

"'A dependency proceeding under section 300 is essentially a bifurcated proceeding.'" (*In re E.E.* (2020) 49 Cal.App.5th 195, 205 (*E.E.*).) First, the court determines whether the child is subject to its jurisdiction—that is, whether the child falls within any of the descriptions set out in section 300. As relevant here, section 300, subdivision (b)(1) authorizes a juvenile court to assert jurisdiction over a child if the

13

"child has suffered, *or there is a substantial risk that the child will suffer*, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." (Italics added.) The burden is on the agency to demonstrate the following three elements by a preponderance of the evidence: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

If the court exercises jurisdiction over the child, it moves to the second part of the proceeding, deciding the appropriate disposition for the child and family. "Generally, the court chooses between allowing the child to remain in the home with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification." (*E.E.*, *supra*, 49 Cal.App.5th at p. 205.) The court may remove the child from parental custody at disposition if it finds, by clear and convincing evidence, that a return home would pose a substantial danger to the child's physical health and there are no reasonable alternatives to removal. (§ 361, subd. (c)(1).)

We review jurisdictional and dispositional findings and orders for substantial evidence, "contradicted or uncontradicted," bearing in mind the heightened burden of proof for a removal order. (*In re R.T.* (2017) 3 Cal.5th 622, 633; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654 (*Kristin H.*).) Because issues of fact and credibility "are the province of the trial court," we do not reweigh the evidence but rather review the record in the light most favorable to the court's determinations and draw all reasonable

14

inferences from the evidence to support the judgment. (*In re R.T.*, at p. 633.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B.    *Jurisdiction*

As a preliminary issue, mother acknowledges that regardless of the outcome her appeal can have no practical effect on the juvenile court's decision to exercise dependency jurisdiction over Frankie. This is because "a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction," and neither she nor father contests the jurisdictional finding against him—that his engaging in domestic violence with mother places Frankie at risk of substantial harm. (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.) Mother asks us, however, to exercise our discretion to reach the merits of her appeal, and the department argues we shouldn't. Because the jurisdictional findings against mother serve as the basis for the dispositional order she also challenges on appeal, and because the findings could impact the current or future dependency proceedings at a point when they're insulated from appellate review, we will exercise our discretion to review them. (See, e.g., *Ibid.* [exercising discretion to review jurisdictional findings for same reasons]; *In re Drake M.* (2012) 211 Cal.App.4th 754, 763 [same].)

1.  *The substance abuse finding*

Mother argues we should reverse the jurisdictional finding that her drug use poses a risk of substantial harm to her daughter. She says her issues with methamphetamine are

15

in the past and that her mere use of the drug during this dependency proceeding is an insufficient basis for asserting jurisdiction. We disagree.

Although mother testified at the hearing that she was sober and hadn't used methamphetamine since she'd tested positive on the day of the detention hearing, the court could disbelieve her based on other evidence in the record. By her own admission and as evidenced by the 2016 dependency, mother has a long history of using methamphetamine. She has also been dishonest and evasive about the extent of her drug use in this case. She told the social worker at the beginning of this case that she had stopped using methamphetamine several months earlier, but then refused to drug test, and not long after tested positive. Instead of viewing the positive test as a wake-up call to start monitoring her drug use and seeking treatment, mother avoided drug testing two months later when the social worker asked her to test and she claimed she was out of town (despite telling the social worker moments earlier that she was at work).

Mother's evasive behavior and failure to acknowledge she has a drug problem provides a sufficient basis for the court to disbelieve her claim of sobriety. (See *Kristin H.*, *supra*, 46 Cal.App.4th at p. 1654 [concluding the mother "exhibited the classic symptoms of the substance abuser" by resorting to drugs "[i]n times of stress" and "denying any such drug use, despite overwhelming evidence to the contrary"].) But the court also had evidence of others saying they believed she was actively using during this dependency. Father and George both expressed concern she had recently been using methamphetamine, and the social worker learned from police records that the dispatcher

16

who took mother's November 15, 2019 call thought she seemed under the influence. Mother points to the fact her daughters Laila and Jayde said they never saw her do drugs, but the girls did not live with mother and, in any event, the court didn't have to give their observations more weight than father's or George's.

As to mother's claim her drug use doesn't pose a risk to Frankie, again, on this record, the court could conclude otherwise. There was no evidence that mother would arrange for safe childcare for Frankie when she was using methamphetamine. The record instead indicates the opposite. Father told the social worker on multiple occasions that mother would leave Frankie with anyone so she could get high. In February 2020, while the department was still investigating the family, father reported that mother had been gone for most of the day, even though Frankie was home and she was supposed to be watching her. He reported that when mother did come home she seemed high on methamphetamine. And, most concerning, mother left Frankie in Gabby's care despite knowing he had inappropriately touched other family members in the past. From this evidence, the court could reasonably infer mother's drug use impaired her judgment to the point she would leave her three-year-old daughter either unattended or in the care of a known child molester.

But in any event, section 300, subdivision (b) does not require that a child *actually* be harmed or neglected before the juvenile court can assume jurisdiction, only that there is a *substantial risk* the child will be harmed or neglected. (§ 300, subd. (b); see also *In re I.J.* (2013) 56 Cal.4th 766, 773.) "The legislatively declared purpose of [section 300] 'is

17

to provide maximum safety and protection for children who are currently . . . being neglected . . . and to ensure the safety, protection, and physical and emotional well-being of children who are *at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J.*, at p. 773.) Additionally, California's dependency law recognizes that, when it comes to children of "tender years" (six years and under), the absence of adequate supervision and care poses an inherent risk to their physical health and safety. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.) Here, the evidence that mother was using methamphetamine while caring for a three-year-old child, refusing to admit the extent of her problem, and trying to evade testing is sufficient to support the jurisdictional finding.

Mother's reliance on cases where the drug use was determined to be insufficient to support jurisdiction is unhelpful because those cases are easily distinguishable from hers. In *In re Destiny S.* (2012) 210 Cal.App.4th 999, the only evidence of methamphetamine use was from a decade-old referral that mother used methamphetamine, which the agency closed after a brief investigation. (*Id.* at p. 1004.) In *In re L.C.* (2019) 38 Cal.App.5th 646, the minor's legal guardian admitted to using methamphetamine on occasion (and only after he arranged for appropriate child care), and once he learned he could lose custody, he immediately began drug testing (on his own initiative) and participating in substance abuse treatment. (*Id.* at p. 650.) In *In re J.A.* (2020) 47 Cal.App.5th 1036, the

18

mother admitted to using edible marijuana while pregnant, "to address her pregnancy symptoms, after having researched that it was a relatively safe alternative," but the evidence demonstrated she had stopped using as soon as the agency told her to. (*Id.* at p. 1047.)

The obvious difference with mother's case is that she used while pregnant with Frankie, has been dishonest about the extent of her use during this dependency, and has been evasive and uncooperative about drug testing. Whereas, in the cases she relies on, the parents and guardians were honest and responsive. They admitted the extent of their use, stopped using, and, in the case of *In re L.C.*, immediately began treatment. These differences are crucial.

We view mother's behavior as closer to that of the mother in *In re Christopher R.*, who had lied about using cocaine during her pregnancy. And, like here, she argued on appeal that "the evidence of her sporadic drug use was insufficient to support the findings she was a current substance abuser and [that her other three children] were at substantial risk of serious physical harm justifying the exercise of the juvenile court's jurisdiction." (*In re Christopher R.*, *supra*, 225 Cal.App.4th at p.1215.) The appellate court rejected this argument, reasoning the juvenile court was free to disbelieve her claim of sporadic drug use, based on her conduct during the case. "[The mother] used cocaine (and, based on the positive toxicology screen for [the infant] at birth, amphetamine and methamphetamine) while she was pregnant, unquestionably endangering the health and safety of her unborn child. She also admitted she had used cocaine in the past although claiming she had

19

stopped using when she was 17 years old. Given her initial false denial of any cocaine use in the days before [her youngest] was born, the juvenile court reasonably disbelieved [her] portrayal of limited, sporadic drug use. . . . This evidence, taken together with [her] unstable lifestyle and cavalier attitude toward childcare . . . fully supports the juvenile court's [jurisdictional] finding." (*Id.* at p. 1217.)

We uphold the finding based on the evidence of mother's history of methamphetamine use, current use, and refusal to acknowledge her problem or consistently drug test.

### 2. *The domestic violence finding*

Mother argues we must reverse the jurisdictional finding based on domestic violence because her conflicts with father are verbal only and don't involve any physical violence. She says her "high conflict relationship" with father may pose a danger to Frankie's emotional health, but not her physical safety.

The problem with mother's argument is that her own statements to the police and the social worker demonstrate otherwise. As we've seen, she called the police on father several times during this case, and at least two of her reports were of physical violence. On November 15, she reported father had recently pushed and punched her. On January 26, she reported he was being violent *in front of the children*. About a month after detention, she told the social worker that father would physically beat her *while Frankie was in her arms* and had recently ripped Frankie from her arms. In addition to her own statements, mother's criminal record shows she has a history of engaging in assaultive

20

behavior that has resulted in a series of court-ordered anger management programs. Domestic violence is a longstanding issue for mother.

We therefore conclude the record sufficiently supports the jurisdiction finding.

### 3. *The finding of failure to protect against sexual abuse*

Mother argues we must reverse the jurisdictional finding for failure to protect Frankie from sexual abuse because, by the time of the hearing, Frankie "was not allowed to visit with the alleged perpetrator." We are not persuaded.

First of all, if Frankie is not currently allowed to be around her uncle Gabby, it is because *father* is being protective, not mother. Second, the fact mother left her three-year-old daughter in a known child molester's care—especially when, just two months earlier, she had her daughter examined for sexual abuse—is cause for legitimate concern over her ability to protect.

Mother's justification for preventing the medical examination after Frankie reported abuse was that she didn't think a child should have to go through that process more than once. This is also concerning from a protectiveness standpoint. It allows the juvenile court to infer that mother sees the investigation of sexual abuse as more traumatizing than the abuse itself, or that she places more importance on avoiding the uncomfortableness of investigation than discovering and preventing abuse.

The bottom line is that even if there were evidence to support mother's argument that *she* is the one not allowing Frankie to be near Gabby, the fact she had previously left

21

her in his care, given what she knew at the time, is enough to support a finding of current risk.

C.    *Disposition*

Mother argues we must reverse the court's removal order because there was insufficient evidence that, by the time of the hearing, she could not safely care for Frankie. She argues that she had been sober for four months and also that her ability to reunify with Frankie in the previous dependency shows that a juvenile court has already determined she can safely care for her daughter.

But the focus of a court's decision whether to return or remove a child is the *current* state of the home and the parents' current circumstances. Mother's ability to reunify with Frankie three years earlier is irrelevant to her present parenting abilities. Much more relevant to her present circumstances is the fact she has so far failed to take any steps to address the issues that led to jurisdiction.

As we've just discussed, the juvenile court reasonably found that mother currently poses a risk to Frankie's safety for three reasons—her use of methamphetamine, her tendency to engage in or be the victim of domestic violence, and her inability to protect Frankie from a dangerous family member. Now, contrary to the department's assertion, these findings are *not* prima facie evidence to support removal. (See *E.E.*, *supra*, 49 Cal.App.5th at p. 218 [reminding the agency that jurisdictional findings are not prima facie evidence to support removal unless the court has adjudicated the child a dependent under § 300, subd. (e) (severe physical abuse)].) However, the fact mother has these

22

issues *in addition to* her refusal to acknowledge them or participate in any services to address them is what supports the removal order. A parent may suffer from issues that warrant asserting jurisdiction over their child, but they can also proactively address them to the point the court feels safe allowing the child to return to their care. That is not what happened here.

Far from addressing her issues, mother has been in denial that she has any, telling the social worker on multiple occasions that she should stop hassling her and focus instead on father's issues. She maintained she didn't have a drug problem even though she had tested positive, and had, by her own admission, recently dropped out of a treatment program. At times mother has even seemed to be in denial of the dependency proceeding itself, violating the court's order against unsupervised contact on at least two occasions. (See *Kristin H.*, *supra*, 46 Cal.App.4th at p. 1658 [concluding mother's refusal to acknowledge her substance abuse issues and "refus[al] to cooperate with professionals" supported a finding that her child-endangering behavior would "reoccur" if her daughter were returned to her care].)

Mother argues that by the time of the hearing she had started therapy, but unfortunately for her, that is a relatively small portion of what she needs to do to address the full scope of her parenting issues. "The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766.) On this record, we conclude the removal order is appropriately protective and supported by the evidence.

# III

## DISPOSITION

We affirm the appealed orders.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH

J.

We concur:

RAMIREZ

P. J.

MILLER

J.